## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| PAULINE PALMISCIANO, On Behalf of Herself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CELATOR PHARMACEUTICALS, INC., MICHAEL R. DOUGHERTY, SCOTT JACKSON, JOSEPH A. MOLLICA, JEAN-PIERRE BIZZARI, RICHARD S. KOLLENDER, JOSEPH M. LOBACKI, SCOTT MORENSTEIN, and NICOLE VITULLO,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No.<br><br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Pauline Palmisciano ("Plaintiff"), by and through her undersigned counsel, for his complaint against defendants, alleges upon personal knowledge with respect to herself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This is a class action brought on behalf of the public stockholders of Celator Pharmaceuticals, Inc. ("Celator" or the "Company") against Celator and its Board of Directors (the "Board" or the "Individual Defendants"), to enjoin the vote on a proposed transaction, pursuant to which Celator will be acquired by Jazz Pharmaceuticals plc ("Jazz") through Jazz's wholly-owned subsidiary Plex Merger Sub, Inc. ("Merger Sub") (the "Proposed Transaction").

2.      On May 31, 2016, Celator and Jazz issued a joint press release announcing that they had entered into an Agreement and Plan of Merger dated May 27, 2016 (the "Merger Agreement") to sell Celator to Jazz.  Subject to the terms of the Merger Agreement, Merger Sub commenced a tender offer (the "Offer") to purchase all of the outstanding shares of Celator common stock for $30.25 in cash for each share of Celator they own (the "Offer Price"). Following consummation of the Offer, Merger Sub will merge with and into Celator with the Company surviving as a wholly-owned subsidiary of Jazz.  The Proposed Transaction is valued at approximately $1.5 billion.  The Offer commenced on June 10, 2016 and will expire on July 11, 2016, and thus, time is of the essence.

3.      The Proposed Transaction is the result of an unfair process and provides the Company's stockholders with inadequate consideration.  As further described below, both the value to Celator stockholders contemplated in the Proposed Transaction and the process by which defendants propose to consummate the Proposed Transaction are fundamentally unfair to Plaintiff and the other public stockholders of the Company.

4.      Furthermore, the Board agreed to lock up the deal with a number of coercive deal protection devices in the Merger Agreement, including: (i) a "no-solicitation" clause that prevents the Company from soliciting, and subject to minimal exceptions, from providing non-public information to potential alternate bidders; (ii) an "information rights" provision that requires the Company to promptly advise Jazz of any proposal or inquiries received from other parties, including the material terms and conditions of the proposal and the identity of the party making the proposal; (iii) "matching rights" that allow Jazz four (4) days to match any superior offer, plus an additional three (3) day period following a material amendment to the terms and conditions of a superior offer or the submission of a new offer; and (iv) a provision requiring

Celator to pay a termination fee of $45.8 million if the Company decides to pursue a competing offer. The collective effect of these provisions is to chill any potential post-deal market check.

5.      Finally, compounding the unfairness of the Proposed Transaction, on June 10, 2016, Celator filed a Recommendation Statement on Schedule 14D-9 Solicitation/ Recommendation Statement (the "Recommendation Statement") with the U.S. Securities and Exchange Commission ("SEC"). The Recommendation Statement, which recommends that Celator stockholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) the background of the Proposed Transaction; (ii) the data and inputs underlying the financial valuation exercises that purportedly support the so-called "fairness opinion" provided by Celator's financial advisor, MTS Securities, LLC ("MTS Securities"); and (iii) Celator's financial projections, relied upon by MTS Securities. The failure to adequately disclose such material information constitutes a violation of sections 14(a) and 20(a) of the U.S. Securities and Exchange Act of 1934 (the "Exchange Act") as stockholders need such information in order to cast a fully-informed vote in connection with the Proposed Transaction.

6.      In short, the Proposed Transaction is designed to unlawfully divest Celator's public stockholders of the Company's valuable assets without fully disclosing all material information concerning the Proposed Transaction to Company stockholders. To remedy defendants' Exchange Act violations, Plaintiff seeks to enjoin the stockholder vote on the Proposed Transaction unless and until such problems are remedied.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the claims asserted herein for violations of sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder

3

pursuant to section 27 of the Exchange Act.

8.       This Court has jurisdiction over the defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

9.       Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff's claims arose in this District, where a substantial portion of the actionable conduct took place, where most of the documents are electronically stored, and where the evidence exists.  Celator is incorporated in Delaware and is headquartered in this District.  Moreover, each of the Individual Defendants, as Company officers or directors, either resides in this District or has extensive contacts within this District.

## PARTIES

10.       Plaintiff Pauline Palmisciano is, and has been at all times relevant hereto, a continuous stockholder of Celator.

11.       Celator, a Delaware corporation, is a clinical-stage biopharmaceutical company specializing in combination therapy and developing products to improve outcomes for patients with cancer.   The Company's corporate headquarters are located at 200 PrincetonSouth Corporate Center, Suite 180, Ewing, New Jersey 08628.  Its common stock is traded on the NASDAQ under the ticker symbol "CPXX."

12.       Defendant Michael R. Dougherty ("Dougherty") has been a director of the Company since July 2013.  Defendant Dougherty was named Chairman of the Board in September 2014, and was named Executive Chairman in August 2015.

4

13.     Defendant Scott Jackson ("Jackson") has been Chief Executive Officer ("CEO") and a director of the Company since April 2008.

14.     Defendant Joseph A. Mollica ("Mollica") has been a director of the Company since 2007.  Defendant Mollica previously served as Chairman of the Board from 2007 until August 2014.  Defendant Mollica is Chair of the Nominating and Governance Committee, and is a member of the Compensation Committee.

15.     Defendant Jean-Pierre Bizzari ("Bizzari") has been a director of the Company since February 2015.  Defendant Bizzari is a member of the Nominating and Governance Committee.

16.     Defendant Richard S. Kollender ("Kollender") has been a director of the Company since August 2012.  Defendant Kollender was previously a Board observer since 2005. Defendant Kollender is a member of the Audit Committee and the Compensation Committee.

17.     Defendant Joseph M. Lobacki ("Lobacki") has been a director of the Company since December 2013.  Defendant Lobacki is a member of the Audit Committee.

18.     Defendant Scott Morenstein ("Morenstein") has been a director of the Company since 2013.  Defendant Morenstein is Chair of the Compensation Committee, and is a member of the Nominating and Governance Committee.

19.     Defendant Nicole Vitullo ("Vitullo") has been a director of the Company since 2005. Defendant Vitullo is Chair of the Audit Committee.

20.     Defendants Dougherty, Jackson, Mollica, Bizzari, Kollender, Lobacki, Morenstein and Vitullo are collectively referred to herein as the "Board" or the "Individual Defendants."

## OTHER RELEVANT PARTIES

21.     Jazz is a public limited company organized under the laws of Ireland with its corporate headquarters located at Fourth Floor, Connaught House, One Burlington Road, Dublin 4, Ireland.  Jazz is a biopharmaceutical company specializing in identifying, developing and commercializing pharmaceutical products.  Jazz trades on the NASDAQ under the ticker symbol "JAZZ."

22.     Merger Sub is a Delaware corporation and an indirect wholly-owned subsidiary of Jazz.

## CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own Celator common stock (the "Class").  Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

24.     Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

25.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class.  As of May 27, 2016, there were approximately 42,871,191 shares of Company common stock issued and outstanding.   All members of the Class may be identified from records maintained by Celator or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

26.     Questions of law and fact are common to the Class, including, among others, whether the Recommendation Statement is materially false and misleading.

27.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the other members of the Class have sustained damages as a result of defendants' wrongful conduct as alleged.

28.     Plaintiff will fairly and adequately protect the interests of the Class, and have no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent. Plaintiff has retained competent counsel experienced in litigation of this nature.

29.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.   Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

30.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

**Company Background and Strong Financial Outlook**

31.     Celator is a clinical-stage biopharmaceutical company specializing in combination therapy and developing products to improve outcomes for patients with cancer.  The Company is working to establish a new treatment in which combination products replace combination regimens of individual agents.  Celator's proprietary technology platform, CombiPlex, identifies the most effective synergistic ratio of the component drugs, optimizing the pharmacology of the drug combination prior to human clinical trials and allowing for simultaneous administration of the components as a single product while maintaining the synergistic ratio of the components after administration.

7

32.     In March 2016, the Company announced that its Vyxeos product, an optimized formulation of the two chemotherapies commonly used to treat secondary acute myeloid leukemia ("AML") has delivered positive phase 3 trial results.  In that trial, Vyxeos delivered overall survival of 9.56 months that significantly outpaced the 5.95 months achieved by patients receiving the standard of care.  Importantly, Vyxeos improves outcomes without increasing safety risks.  The U.S. Food and Drug Administration ("FDA") has already given Vyxeos both breakthrough therapy and fast-track designations, and Vyxeos has been designated as an orphan drug in both the United States and the European Union.

33.     According to the United States National Institutes of Health's ("NIH") National Cancer Institute, 19,950 new cases of AML will be diagnosed this year—constituting 1.2% of all new cancer cases.  The NIH estimates that 10,430 people will die from AML in 2016.

34.     Given the positive testing results for Vyxeos and certain designations in the United States and Europe, Celator is positioned for future growth and success.

35.     On November 12, 2015, Celator issued a press release announcing its third quarter of 2015 financial results.  For the third quarter, the Company reported net losses of $5.2 million and $14.9 million for the three and nine months ended September 30, 2015, as compared to $5.5 million and $14.5 million year over year.  Celator reported having cash and cash equivalents of $24.1 million as of September 30, 2015.  Commenting on the financial results, defendant Jackson stated:

> The momentum builds as we continue to deliver on our milestones, from the induction response rate improvement observed in our Phase 3 study with VYXEOS™ (formerly CPX-351) and announced last quarter, to impressive results from data packages on novel combination programs. The external validation of our proprietary technologies, as evidenced with VYXEOS being selected as the Nanomedicine Product of the Year is very exciting. We expect the overall survival data from the Phase 3 study in the first quarter of 2016.

8

36.     On March 21, 2016, Celator announced its financial results for the fourth quarter and full year of 2015.  The Company reported a net loss of $4.4 million for fourth quarter, compared to $2.4 million year over year.  For the year ended December 31, 2015, net loss was $19.3 million, compared to $16.9 million year over year.  The increase in net loss was primarily attributable to increased interest expense and a reduction in income tax benefit.  The Company reported having cash and cash equivalents of $23.3 million as of December 31, 2015. Commenting on the quarter, defendant Jackson stated:

> In 2015, Celator continued to meet important milestones with VYXEOS™ and the CombiPlex® platform. Recently, we announced positive results from our Phase 3 trial in patients with high-risk (secondary) acute myeloid leukemia (AML), comparing VYXEOS to the long established standard of care, known as 7+3.  We submitted results from the Phase 3 trial to the American Society of Clinical Oncology 2016 Annual Meeting. Based on these results, we expect to submit a New Drug Application to the FDA in the third quarter of this year.  In addition, in 2015 we embarked on a broader clinical development program via several trials evaluating VYXEOS in other AML patient populations as well as other blood cancers. Lastly, we were pleased to report data from novel combinations involving targeted therapies based on our CombiPlex technology platform. This is a very exciting and transformational time for Celator.

37.     On May 10, 2016, the Company issued a press release announcing its financial results for the first quarter of 2016.  For the quarter, Celator reported a net loss of $5.5 million, compared to a net loss of $4.7 million year over year.  The Company reported having cash and cash equivalents of $67.5 million as of March 31, 2016, compared to its cash and cash equivalents holding of $23.3 million as of December 31, 2015.  Commenting on the financial results, defendant Jackson stated:

> The first quarter of 2016 was transformative for Celator. Our Phase 3 trial of VYXEOS™ demonstrated a statistically significant improvement in overall survival, among other benefits, in patients with high-risk acute myeloid leukemia (AML) and we plan to submit a New Drug Application (NDA) to the Food and Drug Administration (FDA) by the end of the third quarter of this year. We look forward to presenting additional data at the American Society of Clinical Oncology (ASCO) annual meeting next month. In addition, following the positive

9

Phase 3 results, we raised capital that we believe is sufficient to fund planned operations into 2018.

**The Flawed Sale Process**

38.     In September 2014, the Company began exploring potential strategic transactions, among other things.  On September 8, 2014, the Company engaged MTS Securities to serve as Celator's financial advisor.  From that time through the spring of 2015, the Board held several telephonic meetings with MTS and its legal counsel to discuss potential strategic alternatives.

39.     On November 13, 2014, defendant Vitullo introduced defendant Jackson to a representative of Jazz.  Defendant Jackson and Celator Chief Business Officer Derek Miller ("Miller") met with the Jazz representative on December 6, 2014, and the companies executed a confidentiality agreement on December 22, 2014.  Celator also held a number of meetings with representatives of pharmaceutical companies, including a company referred to in the Recommendation Statement as "Party A."

40.     In March and April 2015, Jazz and Party A each submitted non-binding indications of interest to acquire the Company.  Each offer valued the Company between $3.00 and $4.00 per share, to be paid in cash, plus a contingent value right ("CVR") valued at a range of $4.00 to $6.75 per share.  The Board subsequently formed a transaction committee on March 17, 2015 consisting of five directors (defendants Vitullo, Jackson, Dougherty, Kollender and Morenstein).

41.     On June 24, 2015, the Company announced the final induction response rate results in the Phase 3 study comparing Vyxeos to the standard of care regimen in patients with untreated high-risk (secondary) AML.

42.     From June 24, 2015 to March 14, 2016, Celator focused on finding a potential partnership arrangement to commercialize Vyxeos outside the United States.  In connection with these efforts, the Company entered into a significant number of confidentiality agreements,

including with a company referred to in the Recommendation Statement as "Party B."  Celator provided non-public information to these entities, though none of the dialogue progressed past a preliminary phase.

43.    On January 11, 2016, Miller and other representatives of the Company met with representatives of Jazz to provide an update on Vyxeos.  Two days later, defendants Jackson and Dougherty and Bruce Cozadd ("Cozadd"), Chairman and CEO of Jazz met to discuss Jazz's interest in Vyxeos subject to receiving and reviewing Phase 3 data.

44.    On January 12, 2016, Miller and defendants Dougherty and Jackson met with representatives of Party B to discuss Vyxeos.

45.    On March 14, 2016, the Company announced positive results from the Phase 3 trial of Vyxeos in patients with high-risk (secondary) AML compared to the standard of care regime of cytarabine and daunorubicin.  Following the announcement, the Company received a significant number of unsolicited inquiries from entities that previously executed confidentiality agreements with the Company, as well as other parties.  The Company entered into fourteen additional confidentiality agreements with third parties and made relevant non-public information available to these parties.  In total, 41 entities executed confidentiality agreements with Celator and received non-public information.

46.    On March 24, 2016, defendants Dougherty and Jackson received a call from Party B's CEO expressing interest in Vyxeos.

47.    On March 29, 2016, the Company completed a public offering of 4.6 million shares of Company common stock at a public offering price of $9.50 per share.

48.     On April 4, 2016, a Jazz representative contacted Miller to congratulate him on the positive Vyxeos results and to express Jazz's desire to re-engage in discussions regarding a strategic transaction involving Celator.

49.     On April 14, 2016, the Company entered into a confidentiality agreement with a company referred to in the Recommendation Statement as "Party C."

50.     On April 18, 2016, Miller and other Celator representatives met with Jazz representatives during an industry conference and planned for an upcoming in-person meeting on April 26, 2016.

51.     On April 26, 2016, Miller and other Celator representatives met with Jazz representatives in Philadelphia, Pennsylvania.   During the meeting, members of Celator management gave a presentation covering a range of topics.

52.     On April 28, 2016, following a call from Cozadd to defendants Dougherty and Jackson, Jazz submitted a written non-binding indication of interest to acquire the Company for $20.00 in cash per share, subject to the completion of due diligence and other customary conditions.  The transaction committee held a telephonic meeting later that day, and directed MTS Securities to engage in discussions with the parties that had expressed interest in the Company.

53.     On May 2, 2016, the Board held a telephonic meeting during which the Board had a preliminary discussion regarding potential conflicts of interest between the Company and members of the Board and/or MTS Securities.  The Board also determined during the meeting to permit discussions with potential counterparties that contemplated partnership arrangements to commercialize Vyxeos outside the United States.  Later that day, MTS Securities distributed a letter to potential bidders at the Board's direction requesting proposals for potential transactions on or before May 20, 2016.

54.     On May 3, 2016, the Company entered into a confidentiality agreement with a company referred to in the Recommendation Statement as "Party D."

55.     On May 11, 2016, the Board held a telephonic meeting during which the Board confirmed that the range of potential bidders contacted by MTS Securities was appropriate in light of the considerations previously discussed by the Board.  The Board instructed MTS Securities to provide a draft of the merger agreement to potential bidders, which MTS Securities did later that day.

56.     From May 2 to May 20, 2016, Celator management met with representatives of potential bidders.  A meeting with Party D took place on May 11, 2016, and a meeting with Party B took place on May 17, 2016.

57.     On May 20, 2016, the Company received six written non-binding indications of interest.  Four indications of interest (from Jazz, Party B, Party C and Party D) contemplated an acquisition of the Company, and two indications of interest (from parties referred to in the Recommendation Statement as "Party E" and "Party F") contemplated a partnership to commercialize Vyxeos outside the United States.  Party B and Party D's indications of interest each proposed acquiring the Company for $21.00 in cash per share.  Jazz's indication of interest proposed acquiring Celator for $20.00 in cash per share, and Party C's indication of interest proposed acquiring the Company for $18.00 in cash per share.  Jazz, Party C and Party D's markups of the Company's proposed form of merger agreement included a request that certain stockholders (and in some cases, Celator directors and officers) enter into support agreements to tender their shares.

58.     With respect to the indication of interest from Party E, the proposal contemplated an upfront payment of $10 million and milestone payments of up to $80 million upon

13

achievement of certain net sales milestones, as well as a 5% royalty on all net sales.  Party F proposed an upfront payment of €30 million and milestone payments of up to €80 million upon achievement of certain net sales milestones, as well as a range of 10% to 20% royalty on all net sales.

59.     On May 22, 2016, the Board held a telephonic meeting during which the Board determined that a sale of the Company would be a more attractive alternative to a partnership with Party E or Party F.  At the Board's direction, MTS Securities informed Jazz, Party B, Party C and Party D that increases in their indications of interest would need to be made by May 25, 2016.  MTS also informed Party E and Party F that the Board was only interested in an acquisition, and these parties indicated they would not be able to submit revised and competitive indications of interest for an acquisition of Celator in a timely manner.

60.     On May 25, 2016, Party C informed MTS Securities that it was no longer interested in pursuing a potential transaction with the Company, as Party C did not believe it could be competitive from an economic standpoint.

61.     Also on May 25, 2016, Celator received revised non-binding indications of interest from Jazz, Party B and Party D.  Jazz proposed an acquisition for $23.00 in cash per share.  Party B proposed an acquisition for $23.00 in cash per share, *plus* an additional $2.00 per share CVR to be paid upon FDA approval of Vyxeos.  Party D proposed an acquisition for $24.50 in cash per share.

62.     On May 26, 2016, the Board held a telephonic meeting, during which it rejected Party D's request for exclusivity.  MTS Securities updated the Board on communications with two other potential bidders that had been substantially involved in due diligence through the latter stages of bidding, but these parties subsequently indicated that, based on the valuation guidance

provided to them by MTS Securities, they would not be able to submit competitive indications of interest.  The Board directed MTS Securities to inform Jazz, Party B and Party D that "best and final" proposals were to be submitted by May 27, 2016.

63.     Between the evening of May 26, 2016 and the morning of May 27, 2016, the Company received revised offers from Jazz and Party B.  Party D informed MTS Securities that their offer would remain at $24.50 in cash per share.  Jazz's revised non-binding indication of interest proposed acquiring the Company for $30.25 in cash per share.  Party B's revised non-binding indication of interest proposed acquiring the Company for $25.50 per share in cash.

64.     On the morning of May 27, 2016, the Board held a telephonic meeting during which the Board discussed the "best and final" offers.  The Board directed representatives of MTS Securities to communicate to Jazz that it had been selected as the winning bidder in the process and that the Board wished to execute a definitive agreement in a timely manner.

65.     Throughout the day, the legal representatives for Celator and Jazz worked to finalize the merger agreement and the Company's disclosure letter.  The Board held a telephonic meeting that afternoon, wherein MTS Securities provided its fairness opinion.

66.     In the evening on May 27, 2016, the parties executed the Merger Agreement and certain of the Company's stockholders and officers executed support and tender agreements to tender their shares in the Offer.  Prior to the opening of the U.S. stock markets on May 31, 2016, Celator and Jazz issued a joint press release announcing the execution of the Merger Agreement.

67.     On June 10, 2016, Jazz and Merger Sub commenced the Offer.

**The Proposed Transaction is Inadequate**

68.     On May 27, 2016, following the Board's approval, Celator entered into the Merger Agreement with Jazz and its subsidiary for inadequate consideration.  On May 31, 2016,

Celator and Jazz issued a joint press release stating, in relevant part:

> DUBLIN and EWING, N.J., May 31, 2016 -- Jazz Pharmaceuticals plc (Nasdaq: JAZZ) and Celator Pharmaceuticals, Inc. (Nasdaq: CPXX) today announced that they have entered into a definitive agreement for Jazz Pharmaceuticals to acquire Celator for $30.25 per share in cash, or approximately $1.5 billion.
>
> * * *
>
> The transaction is structured as a tender offer and second step merger. The closing of the tender offer is conditioned upon customary conditions, including the tender of a majority of the outstanding shares of Celator common stock and expiration or termination of the Hart Scott Rodino waiting period. The transaction is expected to close in the third quarter of 2016.
>
> Certain stockholders of Celator holding approximately 18.4 percent of Celator's outstanding shares of common stock, including executive officers, members of the Celator board of directors and certain investment funds affiliated with the members of the board of directors, have agreed to tender their shares in the tender offer.

69.     Given the potential for increased growth and strong earnings following the possible introduction of Vyxeos to the market, the Proposed Transaction fails to adequately compensate Celator's stockholders for the intrinsic value of the Company, as well as the significant benefits Jazz will receive from the Proposed Transaction.

70.     In a May 31, 2016 *Bloomberg* article entitled "Jazz Pharmaceuticals Agrees to Buy Celator for $1.5 Billion," author Marthe Fourcade ("Fourcade") explains that Jazz's narcolepsy drug Xyrem "accounts for almost 75 percent of revenue and faces patent challenges." Fourcade also noted that Jazz shares fell 1.4 percent following the announcement of the Proposed Transaction. The same article quotes Leerink Partners analyst Jason Gerberry as explaining that the Proposed Transaction "appears favorable for Jazz since it gives the company a drug with strong patent protection that won't expire until sometime between 2024 and 2032." Stifel Nicolaus & Co. analyst Stephen Willey is also quoted in the article as stating that Celator is "a very good strategic fit" with two approved drugs in its hematology and oncology portfolio.

71.     Importantly, the Proposed Transaction fails to adequately compensate Celator's stockholders for the significant benefits that Jazz will receive from the merger.  In the May 31, 2016 joint press release, Cozadd touted the benefits to Jazz, stating:

> Celator Pharmaceuticals is a strong strategic fit with Jazz Pharmaceuticals. VYXEOS will further diversify our product portfolio and is complementary to our clinical and commercial expertise in hematology/oncology. As Celator is currently preparing a regulatory submission in the U.S. for VYXEOS, this acquisition would add a new orphan product with the potential for short- and long-term revenue generation and expansion of our international commercial platform.

72.     Also in the joint press release, defendant Jackson elaborated on the benefits to Jazz:

> The planned combination of Jazz and Celator is highly complementary, as both companies are dedicated to bringing differentiated therapies to patients who have high unmet medical needs. We believe that Jazz Pharmaceuticals' clinical and commercial expertise in hematology/oncology and existing international infrastructure will help realize the value of VYXEOS as a treatment to patients with AML.

73.     Unfortunately for Celator's stockholders, despite the tremendous potential of the Company and the significant benefits to Jazz, the Board members failed to secure a fair deal for the Company, either for the intrinsic value of its assets or the value of the Company's assets to Jazz in a combined entity.

**The Board Impermissibly Locked Up the Proposed Transaction**

74.     The Merger Agreement contains deal protection devices which substantially increase the likelihood that the Proposed Transaction will be consummated, leaving Celator's public stockholders with no meaningful change of control premium for their shares.  When viewed collectively, these provisions, which are detailed below, further the interests of Jazz, certain Individual Defendants and other Celator insiders to the detriment of Celator's public stockholders and cannot represent a justified, appropriate or proportionate response to any threat

posed by a potential third party bidder.

75.    The Individual Defendants have agreed to the following unreasonable deal protection devices:

•    A "no-solicitation" clause that prevents Celator from soliciting, or its directors and officers from even participating in discussions which may lead to a superior proposal from any bidder (Merger Agreement, Section 5.03(a));

•    An "information rights" provision that requires the Company to promptly advise Jazz of any proposal or inquiries received from other parties, including the material terms and conditions of the proposal and the identity of the party making the proposal (Merger Agreement, Section 5.03(d));

•    A "matching rights" provision that allows Jazz four (4) days to re-negotiate with the Board after it is provided with written notice of the Board's intention to make a change of recommendation, plus an additional three (3) day period following a material amendment to the terms and conditions of a superior offer or the submission of a new offer (Merger Agreement, Section 5.03(b)); and

•    A termination fee of $45.8 million payable by the Company to Jazz if Celator decides to pursue a competing bid (Merger Agreement, Section 6.05).

76.    The "no-solicitation" clause, the "information rights" provision, the "matching rights" provision and the termination fee unfairly restrain the Individual Defendants' ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.  The circumstances under which the Board may respond to a third party's written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to

provide an effective "fiduciary out" under the circumstances.

77.     The reason behind these deal protection devices is clear: the absence of a meaningful premium for stockholders creates the very real potential that a third party bidder will attempt to usurp Jazz and submit a higher bid for Celator.  The possibility that a third-party bidder will emerge motivated Jazz to "lock-up" the Proposed Transaction by co-opting the Board and forcing them to adopt unreasonable deal protection devices that would ensure that Jazz could purchase the Company for less than would otherwise be possible.

78.     Taken as a whole, the foregoing deal protection devices and the voting agreements essentially foreclose the possibility that a third-party "white knight" could step forward to provide Celator stockholders with a premium for their shares, instead of the opportunistic and inadequate compensation offered by the Proposed Transaction.

**Insiders' Interests in the Proposed Transaction**

79.     Celator insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders.  The Board and the Company's executive officers are conflicted and in breach of their fiduciary duties because they will receive unique benefits from the Proposed Transaction not available to Plaintiff and the public stockholders of Celator.

80.     While Celator's public stockholders are being cashed out for an inadequate price and foreclosed from participating in the future growth of Celator, in connection with the merger the Company's directors and officers will achieve a substantial payday.  Under section 2.10 of the Merger Agreement, upon consummation of the merger Celator's directors and officers will receive cash payments for all outstanding stock options, whether or not vested, in amounts equal to the Offer Price - an opportunity that would not otherwise be available. Defendant Jackson alone stands to receive over $23 million in cash payments for his outstanding stock options.  The vested and unvested stock options held by the Company's

directors and executive officers, as well as the consideration to be paid to these individuals for their options in connection with the Proposed Transaction, are detailed in the following chart:

| Name | Vested Options to be Canceled in Exchange for the Option Merger Consideration | | Unvested Options to be Accelerated and Canceled in Exchange for the Option Merger Consideration | | |
| | Number of Options | Option Merger Consideration | Number of Options | Option Merger Consideration | Total Merger Consideration of Options |
|---|---|---|---|---|---|
| *Executive Officers* | | | | | |
| Michael R. Dougherty | 188,306 | $ 5,266,028 | 488,751 | $ 13,764,655 | $ 19,030,693 |
| Scott T. Jackson | 837,944 | $ 23,094,817 | 591,499 | $ 16,611,632 | $ 39,706,449 |
| Lawrence Mayer, Ph.D. | 267,018 | $ 7,307,398 | 301,875 | $ 8,521,031 | $ 15,828,430 |
| Fred M. Powell | 291,938 | $ 8,026,271 | 260,437 | $ 7,323,699 | $ 15,349,971 |
| *Directors* | | | | | |
| Jean-Pierre Bizzari | 11,667 | $ 320,609 | 30,333 | $ 835,931 | $ 1,156,540 |
| Richard S. Kollender | 36,164 | $ 983,854 | 19,836 | $ 547,298 | $ 1,531,152 |
| Joseph A. Mollica | 62,832 | $ 1,700,690 | 19,836 | $ 547,298 | $ 2,247,988 |
| Scott Morenstein | 36,164 | $ 983,854 | 19,836 | $ 547,298 | $ 1,531,152 |
| Nicole Vitullo | 36,164 | $ 983,854 | 19,836 | $ 547,298 | $ 1,531,152 |
| Joseph M. Lobacki | 29,165 | $ 786,509 | 26,835 | $ 734,731 | $ 1,521,240 |

81.    Additionally, Celator's directors and officers will receive substantial cash consideration for their significant holdings of Celator stock.  By pursuing and approving the Proposed Transaction, Celator's directors and officers will gain liquidity for their otherwise illiquid Celator holdings, as seen in the following chart:

| Name | Shares of Common Stock Beneficially Owned | | Total Merger Consideration of Shares ($) |
|---|---|---|---|
| *Executive Officers* | | | |
| Michael Dougherty | 20,000 | | $ 605,000 |
| Scott Jackson | 50,043 | | $ 1,513,801 |
| Lawrence Mayer | 118,614 | | $ 3,588,074 |
| Fred Powell | 31,458 | | $ 951,605 |
| *Directors* | — | | — |
| Jean-Pierre Bizzari | — | | — |
| Richard S. Kollender | — | (1) | — |
| Joseph A. Mollica | — | | — |
| Scott Morenstein | 6,635 | (2) | $ 199,427 |
| Nicole Vitullo | — | (3) | — |
| Joseph M. Lobacki | — | | — |

82.     Further, defendants Dougherty and Jackson and other Company officers stand to receive significant change-in-control payments, as detailed in the chart below:

| Name | Cash (1) | Equity (2) | Perquisites/ Benefits (3) | Total Value |
|---|---|---|---|---|
| Michael Dougherty | $            — | $  13,764,655 | $             — | $  13,764,655 |
| Scott Jackson | $  1,127,250 | $  16,611,632 | $  56,000 | $  17,794,882 |
| Lawrence Mayer | $     405,486 | $    8,521,031 | $  18,835 | $    8,945,352 |
| Fred Powell | $     362,253 | $    7,323,699 | $  24,000 | $    7,709,952 |

83.     Unsurprisingly, certain Celator stockholders holding approximately 18.4% of Celator's outstanding shares of common stock, including executive officers, members of the Board and certain investment funds affiliated with the members of the board of directors, have agreed to tender their shares in the tender offer.

84.     Instead of attempting to negotiate an agreement reflecting the best consideration reasonably available for the Celator stockholders they are duty-bound to serve, the Individual Defendants disloyally placed their own interests first, and tailored the terms and conditions of the Proposed Transaction to meet their own needs and objectives.  The Board's efforts to advance its members' and officers' personal interests at the expense of the Company's public stockholders have resulted in the inadequate Proposed Transaction being presented to the stockholders at an untenable and inadequate price.

85.     Accordingly, Company insiders stand to receive significant benefits and thus have reason to support the Proposed Transaction, which is otherwise against the best interests of the Company's stockholders.

**The Recommendation Statement Contains Numerous Material Misstatements or Omissions**

86.     Compounding the unfair sale process and inadequacy of the Merger Consideration, the defendants also filed the materially incomplete and misleading Recommendation Statement with the SEC and disseminated it to Celator's stockholders.  The

Recommendation Statement misrepresents or omits material information that is necessary for the Company's stockholders to make an informed decision whether to vote in favor of the Proposed Transaction.

87. Specifically, as set forth below, the Recommendation Statement fails to provide Company stockholders with material information or provides them with materially misleading information concerning: (i) the flawed sale process that resulted in the Proposed Transaction; (ii) the data and inputs underlying MTS Securities' financial valuation exercises; and (iii) management's financial projections relied upon by the Company's financial advisor, MTS Securities in its analyses.  Accordingly, Celator stockholders are being asked to vote for the Proposed Transaction without all material information at their disposal.

***Material Omissions Concerning MTS Securities' Material Financial Analyses***

88. The Recommendation Statement describes MTS Securities' fairness opinion and the various valuation analyses it performed in support of its opinion.  However, the description of MTS Securities' fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses.  Without this information, as described below, Celator's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on MTS Securities' fairness opinion in determining whether to vote in favor of the Proposed Transaction.  This omitted information, if disclosed, would significantly alter the total mix of information available to Celator's stockholders.

89. With respect to the *Discounted Cash Flow Analysis*, the Recommendation Statement fails to disclose:

(a) The range of 2017 prices per vial used in the analysis;

(b) The unlevered free cash flow figures for the period beginning on July 1, 2016 and ending on December 31, 2030 used in the analysis; and

(c)     All assumptions underlying MTS Securities' estimate of Celator's weighted average cost of capital ("WACC").

90.     Without such undisclosed information, Celator stockholders cannot evaluate for themselves whether the financial analyses performed by MTS Securities were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness opinion could be rendered in connection with the Proposed Transaction.  In other words, full disclosure of the omissions identified above is required in order to ensure that stockholder can fully evaluate the extent to which MTS Securities' opinions and analyses should factor into their decision whether to tender their shares.

***Material Omissions Concerning Celator's Financial Projections***

91.     The Recommendation Statement indicates that MTS Securities relied on certain internal projections for fiscal years 2016-2030 in rendering its fairness opinion.  However, the Recommendation Statement fails to disclose the probability of success factor assigned to each of the patient populations in each of the Low Case, Base Case and High Case, used to derive the Risk Adjusted Cash Flows.

92.     Additionally, with respect to each of the Low Case, Base Case and High Case the Recommendation Statement fails to disclose for fiscal years 2016-2030, the following line items:

(a)     Depreciation and Amortization;

(b)     Taxes (or tax rate);

(c)     Capital Expenditures;

(d)     Changes in Net Working Capital;

(e)     Stock-based compensation expense;

(f)     Unlevered free cash flow ("UFCF"); and

(g)     Any other adjustments to UFCF.

93.     This material omission of the best estimates of the Company's financial future needs to be remedied prior to the stockholder vote in order to allow Celator stockholders to make a fully informed decision on the Proposed Transaction.

**Material Omissions Concerning the Flawed Sale Process**

94.     The Individual Defendants fail to disclose material information relating to, among other things, the sales process leading up to the Proposed Transaction, including:

(a)     the potential conflicts of interest cited in the Recommendation Statement between the Company and members of the Board and/or MTS Securities discussed during the Board's telephonic meeting on May 2, 2016;

(b)     the services performed and fees received by MTS Securities for Jazz in the two years prior to the issuance of its fairness opinion;

(c)     the timing and nature of all communications regarding future employment of Celator's management, including who participated in all such communications; and

(d)     whether the executed confidentiality agreements with parties, other than Jazz, contained standstill provisions, and if so, the details of any standstill provisions. This information is particularly important for stockholders in order to assess whether the 41 entities that executed confidentiality agreements with Celator are currently precluded from making a topping bid for the Company based on the terms of any standstill provisions.

95.     Defendants' failure to provide Celator stockholders with the foregoing material information constitutes a violation of sections 14(a) and 20(a) of the Exchange Act, and SEC Rule 14a-9 promulgated thereunder. The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Recommendation Statement. Absent disclosure of the foregoing material

information prior to the stockholder vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed decision whether to vote in favor of the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

## COUNT I

**Class Claims Against All Defendants for Violations of Section 14(a) of the Exchange Act And SEC Rule 14a-9 Promulgated Thereunder**

96.     Plaintiff repeats all previous allegations as if set forth in full.

97.     SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

98.     During the relevant period, defendants disseminated the false and misleading Recommendation Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

99.     By virtue of their positions within the Company, the defendants were aware of this information and of their duty to disclose this information in the Recommendation Statement. The Recommendation Statement was prepared, reviewed, and/or disseminated by the defendants.

The Recommendation Statement misrepresented and/or omitted material facts, including material information about the unfair sale process for the Company, the unfair consideration offered in the Proposed Transaction, and the actual intrinsic value of the Company's assets. The defendants were at least negligent in filing the Recommendation Statement with these materially false and misleading statements. The defendants have also failed to correct the Recommendation Statement and the failure to update and correct false statements is also a violation of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

100.    The omissions and false and misleading statements in the Recommendation Statement are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Recommendation Statement and in other information reasonably available to stockholders.

101.    By reason of the foregoing, the defendants have violated section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

102.    Because of the false and misleading statements in the Recommendation Statement, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

### Class Claims Against the Individual Defendants for
### Violation of Section 20(a) of the Exchange Act

103.    Plaintiff repeats all previous allegations as if set forth in full.

104.    The Individual Defendants acted as controlling persons of Celator within the

meaning of section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers or directors of Celator and participation in or awareness of the Company's operations or intimate knowledge of the false statements contained in the Recommendation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

105.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Recommendation Statement and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

106.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Recommendation Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of this document.

107.    In addition, as the Recommendation Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Recommendation Statement purports to describe the various issues and information that they reviewed and considered — descriptions which had input from the Individual Defendants.

108.    By virtue of the foregoing, the Individual Defendants have violated section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor on behalf of Celator, and against defendants, as follows:

A.      Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.      Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction;

C.      In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.


Dated: June 27, 2016

/s/Aaron Rubin
_____

**NEUHAUSER, RUBIN & MENDLOWITZ, LLC**
Aaron Rubin
701 Cross Street, Suite 266
Lakewood, New Jersey 08701
T (516) 590-0544
F (516) 506-0832
arubin@nrmlawllc.com
*Attorneys for Plaintiff*

**WEISSLAW LLP**
Richard A. Acocelli

Michael A. Rogovin
Kelly C. Keenan
1500 Broadway, 16th Floor
New York, New York 10036
Tel: (212) 682-3025
Fax: (212) 682-3010
*Attorneys for Plaintiff*